IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KIYANNA MCGHEE,

                        Plaintiff,                              **4:23CV3163**

            vs.

MARTIN O'MALLEY, Commissioner of              **MEMORANDUM AND ORDER**
Social Security,

                        Defendant.

This is an action for judicial review for a final decision of the Commissioner of the Social Security Administration ("Commissioner"). Filing No. 1. Plaintiff Kiyanna McGhee (hereinafter "McGhee or claimant") appeals a final determination of the Commissioner denying her application for Social Security benefits. *See* Filing No. 15 (McGhee's Motion to Reverse) and Filing No. 18 (Commissioner's Motion to Affirm). A transcript of the hearing held on July 27, 2022, is found in the record at Filing No. 10-2 at 42. This Court has jurisdiction to review this matter under 42 U.S.C. § 405(g).

## I.    BACKGROUND

### A. Procedural History

On August 22, 2020, plaintiff McGhee at the age of thirty-nine, filed an application for Social Security Disability ("Disability") benefits under Title II of the Social Security Act; and on February 11, 2021, for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. Filing No. 10-5 at 2 and 15; Filing No. 10-3 at 4. McGhee alleges a disability onset date of August 1, 2016. Filing No. 10-5 at 2 and 15. McGhee's applications were denied initially on May 28, 2021, and upon reconsideration on September 24, 2021. *Id.*

McGhee requested and was granted a hearing before an administrative law judge ("ALJ") on July 27, 2022.

Prior to the hearing, the alleged onset date was amended to March 1, 2019. Filing No. 10-2 at 22. On July 27, 2022, a video hearing was held where McGhee testified to her disabling limitations. Id. at 42–79. After the hearing, the ALJ denied benefits on August 19, 2022. On July 3, 2023, the Appeals Council denied further review, and the ALJ's decision stands as the final decision of the Commissioner. Id. at 2.

McGhee seeks review of the final decision of the Commissioner, arguing the ALJ's decision is not supported by substantial evidence and relied upon an incomplete Residual Functional Capacity ("RFC") to determine McGhee could perform other work. Filing No. 15-1 at 1. McGhee also argues the ALJ conducted an improper Drug Addiction or Alcoholism ("DAA") analysis to determine her mental health impairments would improve to the point of non-disability. Id. at 1–2.

### B. Hearing Testimony

McGhee was born in 1981 and has past relevant work experience as a certified nurse assistant, home health aide, and hair stylist. Filing No. 10-2 at 49. At the hearing on July 27, 2022, McGhee stated she is five foot three inches and weighs about one hundred and ten pounds. Id. at 56. McGhee stated her most recent job was at Right At Home in 2019, and she worked about zero to four hours a week. Id. at 47. When asked by the non-attorney representative why she had to stop working, McGhee testified it was because of "mental and health issues." Id. at 52.

McGhee stated her mental health diagnosis includes severe PTSD, anxiety, and bipolar disorder. Filing No. 10-2 at 52. She indicated she also suffers from extreme and

sharp head pain twenty-four hours a day, neurological issues where she shakes, and has nightmares. *Id.* at 53. McGhee testified she has had issues with anemia and had two blood transfusions in December 2021. *Id.* McGhee stated she has a degenerated disc in her neck and the pain goes down her left shoulder, left arm, left leg, and to her feet. *Id.* at 53–54.

McGhee testified she has breathing issues both day and night. Filing No. 10-2 at 54. She stated at nighttime, she stops breathing, and will wake gasping and coughing. *Id.* She testified that during the daytime she can barely get around because she is low on oxygen and can only go short stints before she must squat and breathe. *Id.* When asked by the representative if she deals with any issues in her digestive system or stomach, McGhee responded yes, and that she cannot digest food because she has issues in her lower intestine and is on daily medications for this. *Id.* at 55. She stated if she doesn't take the medications, she feels full. *Id.* McGhee also testified she struggles with bulimia. *Id.*

McGhee further stated she has issues with severe bleeding and a degenerated disc in her back. Filing No. 10-2 at 56. McGhee testified she is currently wearing two knee braces and a foot brace. *Id.* at 57. McGhee stated she has a wound on her foot that will not heal and cannot get surgery because it might cause an infection. *Id.* The representative then asked McGhee if there was another surgery because of her bleeding "that they want to do that they can't do right now." *Id.* at 58. McGhee did not understand the question. The representative clarified by asking "have they talked about a hysterectomy." *Id.* McGhee said yes, but because her body's so weak, they are not comfortable doing the surgery right now with so many health issues. *Id.* McGhee testified

3

her insurance company denied an MRI for neurological issues. *Id.* The representative asked if the MRI had to do with her headaches, to which McGhee responded, "yes along with the other things." *Id.*

In terms of education, McGhee testified the highest grade she finished was sixth. Filing No. 10-2 at 59. She stated she has been a CNA since she was twenty-two years old. McGhee testified she took a free class paid for by the state of Nebraska. *Id.* at 59–60.

In terms of living arrangements and daily activities, McGhee testified she lives with her twenty-seven-year-old daughter and fourteen-year-old son. Filing No. 10-2 at 61. McGhee stated she spends the day in bed, sleeping or watching TV. *Id.* She testified she does not do laundry, shop for groceries, mow the lawn, or clean the shower, and could not do those activities even if she wanted to do so. *Id.* at 61–62. When asked by the ALJ why and what would stop her from making a simple meal for her family, McGhee responded "physically and mentally. The physical issues as far as what I have." *Id.* at 62. From a mental standpoint, she stated she cannot focus or concentrate to make a simple meal like soup or sandwiches because she would reach in the refrigerator and not know where the lunchmeat is. *Id.* at 63. From a physical standpoint, McGhee testified she could not make a sandwich or put soup in a pan on the stove to warm it up, like grabbing a pan, pulling it out, and setting it on the stove. *Id.* at 64. She explained she would be lucky if her hands did not "freeze" and "lock." *Id*. McGhee stated the last time she cooked a meal was about ten years ago, and it was mac and cheese. *Id.* at 65.

McGhee testified Dr. Fawn Jin is her primary doctor. Filing No. 10-2 at 65. When asked by the ALJ what Dr. Jin is treating her for or what conditions she is helping, McGhee

stated "to keep up with everything is hard." *Id.*  When asked again by the ALJ what she is helping with, McGhee responded, "everything's all blurry" and "it's hard—several things." *Id.*  McGhee testified she is still seeing Dr. Jin and has been seeing her three or four times a month for about two or three years. *Id.* at 66.

McGhee stated John Ramsey is a psychologist, and she no longer sees him because she was transferred over to somebody else the week before. Filing No. 10-2 at 66.  McGhee indicated Mark Darby is one of her new psychologists, and she has seen him probably eight or ten times. *Id.* at 66–67.

McGhee testified she does not consume any alcohol whatsoever. Filing No. 10-2 at 67.  She indicated the most recent time she consumed any alcohol was a month ago. *Id.*  She stated there was a time when she was drinking quite a bit, but she had not for a month. *Id.* at 68.  The ALJ referred to notes from October 2021 in which McGhee was getting up at six in the morning and would drink all day until she passed out—about two bottles of wine a day, which McGhee confirmed at the hearing. *Id.* at 68–69.  She stated using alcohol back then was to help when no psychological or pain medication worked. *Id.* at 69.  When asked by the ALJ how adjusting medication had anything to do with drinking—getting up at six in the morning and drinking all day until passing out—McGhee responded it helped with not being able to sleep when the medication was not working, and she was having pain and psychological issues. *Id.*  McGhee testified she has been able to stop overusing, and it has been a month or close to two months, but a month for sure. *Id.*  McGhee stated she could not summarize the medications she was taking. *Id.* at 69–70.

A Vocational Expert ("VE") also testified at the hearing. Filing No. 10-2 at 71. She was asked hypothetical questions by the ALJ and non-attorney representative to determine McGhee's occupation base. Id. at 71–77. For each occupation base, the VE testified as to the job, SVP (Specific Vocational Preparation), and Reasoning Level. Id.

### C. Medical Evidence

McGhee's medical records reflect she has been diagnosed at various times with anemia, migraines, and alcoholism. McGhee was treated by her primary care provider, Austin L. Rivett, DO, who specializes in family medicine, from August 2017 to August 2019. Filing No. 11-1 at 37, 147. On September 19, 2019, McGhee established care with Fawn Jin, DO, who specializes in internal medicine, as her primary care provider. Id. at 175.

### i. Anemia

McGhee saw Nancye D. Hasiak, APRN-NP on February 9, 2016, May 17, 2016, June 8, 2016, and August 25, 2017. Filing No. 11-1 at 275, 268–69, 264, 253–54. The first appointment was McGhee's annual well woman exam, and she continued treatment for bleeding with birth control pills, which she reported has worked for the last five years. Id. at 275. At her second appointment, she went in for abnormal uterine bleeding (spotting) and STI testing and was prescribed Flagyl. Id. At the third visit, the follow-up, McGhee reported no further bleeding and discomfort. Id. at 264. On her final visit with Nurse Practitioner Hasiak, McGhee went in for her annual well woman exam and mentioned increased heavy bleeding. Id. at 253–54. She reported that she stopped taking her birth control pills because they were recently making her bleed heavily and she

has not been using anything for the heavy bleeding since. *Id*. She was ordered an ultrasound to determine next steps. *Id*.

On May 11, 2018, McGhee's ultrasound results showed one fibroid that was benign and not problematic. Filing No. 11-1 at 246. McGhee stated she would monitor bleeding, call with new or worsening symptoms, and declined Mirena IUD or ablation at that time. *Id*. On April 19, 2019, McGhee saw Hasiak for an annual well woman exam and visit notes state McGhee reported heavy bleeding over the past two months and indicates heavy bleeding has been controlled in the past with birth control pills; McGhee was prescribed birth control pills for treatment. *Id*. at 242–43. On May 16, 2019, progress notes from Gary D. Volentine, MD, who specializes in gastroenterology and treats McGhee for severe chronic constipation and mentions recent laboratory results suggesting severe iron deficiency anemia. *Id*. at 240 and 331–32. August 12, 2019, blood tests showed low iron and low iron saturation. *Id*. at 79. On September 15, 2019, McGhee went to the emergency department for chest pain, shortness of breath, diaphoresis, night sweats, and weight loss; reported negative for activity change, appetite change, chills, fatigue, fever, dizziness, tremors, weakness, light-headedness, numbness, and headaches; and was discharged in stable condition with instructions to follow up with her primary care provider, Dr. Rivett. *Id*. at 221, 223, 225. The records at this emergency department visit do not mention anemia, and anemia was not found in completed blood tests. *Id*.

On August 11, 2020, McGhee denied numbness, weakness or tingling, and tremor during visit with John M. Ramsey, APRN, who specializes in psychology/mental health. Filing No. 11-1 at 96. On September 20, 2020, lab results show low iron and iron

7

saturation. *Id*. at 583.  On September 21, 2020, McGhee stated she was not having any shortness of breath or chest pain.  *Id*. at 597.  On September 23, 2020, McGhee was placed on birth control pills by Jayme R. Clara, APRN-NP to treat her anemia because she stated good results previously to reduce her menstrual flow.  *Id*. at 206–09.  On October 9, 2020, McGhee requested and received a refill for birth control pills.  On December 11, 2020, McGhee had an initial consult with Melissa A. Mathes, MD, who specializes in obstetrics and gynecology, and reported heavy bleeding during periods and that she had been prescribed birth control pills but had stopped taking them over one month ago because she did not get any relief.  *Id*. at 196.  Dr. Mathes recommended IUD as best option for treating heavy uterine bleeding, but McGhee was unsure on desired method and was provided information pamphlets to help with decision before her next appointment.  *Id*. at 198.

On August 17, 2021, McGhee saw Hasiak for her annual well woman exam and requested STI testing and indicated heavy bleeding; the STI testing came back negative. Filing No. 12-2 at 237 and 249.  On September 30, 2021, McGhee saw Andy R. Welstead, DO, who specializes in internal medicine, with complaints of anemia, heavy cycles, chills, and chest pains, and had an appointment scheduled with OBGYN the following week.  *Id*. at 87.  On December 24, 2021, McGhee went to the emergency department for heavy menstrual bleeding and had associated symptoms of dizziness, diaphoresis, and chills. *Id*. at 214.  She was admitted due to abnormal uterine bleeding and acute blood loss anemia and was given two units of packed red blood cells. *Id*. at 228–29.  Notes indicate that McGhee felt much improved following transfusion, hemoglobin improved appropriately, bleeding slowed significantly, and she was deemed stable for discharge.

*Id.* at 229.   On December 29, 2021, McGhee saw Hasiak for a follow up after the emergency department and reported she felt better but still gets tired and easily winded; she had been on birth control pills, but had stopped them over a year ago and had no problems with bleeding until now; decided to move forward with IUD procedure, understanding no guarantee it will be successful; and was counseled she may experience increased cramping and heavier bleeding for the first three to six months following IUD insertion.  *Id.* at 238 and 241.

On January 7, 2022, March 18, 2022, and April 18, 2022, records with David J. Inda, MD, an orthopedic surgeon, listed anemia as a comorbidity.  Filing No. 12-2 at 263, 280, 282.  On February 24, 2022, records with Mark G. Franco, MD, who treated McGhee for bilateral knee pain, list reported past medical history of anemia.  *Id.* at 285.  At an appointment with Dr. Jin on March 1, 2022, McGhee reported heavy menstrual bleeding is much improved after IUD placement.  *Id.* at 334.  At McGhee's first visit with OBGYN William W. Jurgensen, MD on March 30, 2022, she stated the IUD had been effective.  *Id.* at 342.

### ii.  Migraines

On August 11, 2017, McGhee went to the emergency department for intermittent bilateral temporal headaches for two weeks.  Filing No. 11-1 at 255.  On April 27, 2018, McGhee went to the emergency department for left ankle pain and visit notes from Amy Cutright, MD state a history of migraines.  *Id.* at 248.  On May 10, 2018, McGhee saw Dr. Volentine for constipation, and progress notes state a history of migraines.  *Id.* at 246. McGhee went to the emergency room on September 6, 2019, complaining of a headache, dizziness, and nausea, and stated she was prescribed hypertension medication by her

primary care provider but did not want to take it because she was scared of side effects. *Id*. at 228. She eloped from the hospital before reevaluation or further workup could be performed. *Id*. at 231.

On September 15, 2019, emergency department medical records state a history of migraines, but the review of systems state negative for dizziness, tremors, weakness, light-headedness, numbness, and headaches. Filing No. 11-1 at 222 and 223. On September 19, 2019, McGhee established care with Dr. Jin as her primary care provider and visit notes indicate she had tried blood pressure medicine in the past, went to the emergency room a week ago for hypertension headaches, and the labs were unremarkable. *Id*. at 175. Her records show a new onset of tension headaches along with chronic migraines, which Dr. Jin suspected were likely triggered by stress and anxiety. *Id*.

On January 30, 2020, visit notes with Dr. Jin state the patient is doing better, and anxiety, insomnia, and migraine are much better controlled with her Zoloft medication. Filing No. 11-1 at 168. On August 7, 2020, McGhee saw Dr. Jin to discuss worsening anxiety, depression, and mentioned frequent migraine headaches; she was prescribed medication. *Id*. at 162. On August 11, 2020, McGhee denied chronic pain and headaches to her psychologist, John Ramsey. *Id*. at 96. On September 22, 2020, McGhee saw Dr. Jin and reported migraine headaches had improved and were not as frequent, but she still had flareups. *Id*. at 152. On October 8, 2020, her neurologic examination was normal, and the doctor agreed with Dr. Jin's present management of her migraine headaches. *Id*. at 129.

On July 16, 2021, records with Dr. Inda list other past medical history of chronic/recurring headaches. Filing No. 12-2 at 270. On October 26, 2021, Dr. Jin noted that during her appointment, chronic headache/migraine is multifactorial; needs clarification on current medication; and he instructed McGhee to avoid alcohol. Id. at 142.

On January 7, 2022, March 18, 2022, and April 18, 2022, records with Dr. Inda list migraines as a comorbidity. Filing No. 12-2 at 263, 280, 282. On February 22, 2022, records with Dr. Jin state McGhee had had chronic headaches but denied any new neurological symptoms. Id. at 327. On February 24, 2022, records with Dr. Franco list other past medical history of chronic/recurring headaches and reported past medical history of migraines. Id. at 284–85. On March 1, 2022, McGhee saw Dr. Jin for headaches and was ordered an MRI, which was later declined by insurance. Id. at 334. On March 30, 2022, McGhee saw Dr. Jurgensen and stated history of migraine headaches. Id. at 342.

### iii. Alcohol

As with many persons who drink excessively, McGhee's medical records and testimony are inconsistent, although they show an overwhelming drinking problem. On January 11, 2018, medical records indicate McGhee had two glasses of wine two to three times a week. Filing No. 11-1 at 63. On August 11, 2020, Ramsey noted alcohol addiction and her progress notes state McGhee:

> [P]resents today for psychological assessment along with her daughter to the clinic. She is taking sertraline 150 mg currently which has not helped much with her depression, anxiety, or PTSD issues . . .. She began to get upset and she made repeated assurances that she would stop drinking if she had medications to help with depression. It's like an endless cycle as she drinks to help with depression which exacerbates her depression which causes her to use medications to help with depression.

Filing No. 11-1 at 86–87.  Ramsey additionally noted "she also says that she is not good at taking medications as well and her depression is exacerbated by alcohol use on a daily basis" and "her alcoholism is exacerbating her depression and causing her to be unreliable in taking medications." Id. at 91, 93 and 98.  McGhee stated she uses alcohol every night and drinks about one bottle and a box of wine. Id. at 92.  She saw Ramsey once more on September 17, 2020, cancelled her appointment on October 21, 2020, because she did not feel well, and did not reschedule her appointment until June 2021, for medication. Id. at 104.

On September 18, 2020, McGhee saw Salema Stewart-Hunter, PLMHP for an individual therapy appointment and stated current alcohol use of one drink per week and twenty-four days of binge drinking per year. Filing No. 11-1 at 455.  On October 2, 2020, McGhee had an initial appointment with Lauren Christensen, PLMHP for individual therapy and denied the use of substances. Id. at 452.  On October 8, 2020, McGhee stated during visit with Joel T. Cotton, MD, a neurologist, she drinks very little wine. Id. at 130.  Records from October 12, 2020, indicate McGhee drinks wine occasionally. Filing No. 12-2 at 442.

On October 19, 2020, McGhee saw Dr. Jin and reported currently drinking one bottle of wine four times a week and used to drink one bottle daily. Filing No. 11-1 at 140; Filing No. 12-1 at 16.  On October 20, 2020, McGhee saw Christensen for individual therapy and denied the use of substances. Filing No. 11-1 at 443.  On October 22, 2020, McGhee reported during her first behavioral health visit with Mark Darby, APRN FNP C daily use of marijuana, up to two bowls or less, and drinking wine four times a week, up to a liter per day, and has done so for years. Id. at 439.  Darby prescribed McGhee

depression and anxiety medication at this appointment. *Id.* at 442. On October 30, 2020, November 6, 2020, November 13, 2020, November 24, 2020, December 1, 2020, and January 19, 2021, McGhee saw Christensen and denied the use of substances. *Id.* at 436, 425, 422, 419, 415, 402. On November 3, 2020, McGhee saw George Lampkin, LIMHP for an initial diagnostic interview and answered current alcohol use of one drink per week and twenty-four days of binge drinking per year. *Id.* at 431. On December 15, 2020, McGhee saw Christensen and did not mention alcohol use. *Id.* at 412. On December 16, 2020, McGhee saw Darby for a second appointment and records indicate occasional wine one time a week, one small box. *Id.* at 407.

On February 9, 2021, McGhee reported current alcohol use during emergency department visit. Filing No. 11-1 at 469. On March 26, 2021, and April 9, 2021, McGhee saw Lauren Christensen, PLMHP for individual therapy and denied the use of substances. *Id.* at 517; Filing No. 12-2 at 25. On June 17, 2021, McGhee visited Ramsey to be prescribed medications again. Filing No. 12-2 at 6. On August 19, 2021, McGhee had her third visit with Darby and reported drinking up to six glasses of wine every day, smoking several bowls of marijuana daily, and taking extra medications; she was prescribed additional anxiety medications to treat her drinking problem. *Id.* at 20 and 24. On August 24, 2021, McGhee saw Dr. Jin for heart palpitations and fluttering sensation, and stated she was no longer drinking and has wine only occasionally. *Id.* at 77. On October 26, 2021, McGhee saw Dr. Jin with her twenty-five-year-old daughter for follow-up with complaints of dizzy (blacked out), heavy sweats, stressed out, and memory. *Id.* at 139. The daughter stated McGhee missed her OBGYN appointment for menstrual bleeding, repeats herself constantly, and is unable to administer her own medication

correctly. *Id*. McGhee admitted she had been drinking the equivalent of two bottles of wine daily, had been having alcohol dependence for the past seven years, denied any withdrawal symptoms, and wakes up at six in the morning to start drinking until she passes out. *Id*.

At an appointment with Dr. Jin on March 1, 2022, McGhee's daughter stated McGhee had drinking alcohol for the past one month. Filing No. 12-2 at 334. On April 26, 2022, records state McGhee drinks wine occasionally. *Id*. at 438. On May 5, 2022, at her medication management appointment via Zoom with Ramsey, McGhee stated she has been off medications and is struggling with her depression and anxiety. *Id*. at 406.

### D. The ALJ's Findings

In evaluating McGhee's claim, the ALJ followed the sequential evaluation process. Filing No. 10-2 at 22. The ALJ found McGhee "has not engaged in substantial gainful activity since March 1, 2019, the amended alleged onset date." *Id*. Next, the ALJ found McGhee "has the following severe impairments: degenerative disc disease of the cervical and lumbar spines, degenerative joint disease of the bilateral knees, right ankle injury, major depressive disorder, generalized anxiety disorder, and alcoholism." *Id*. Because there was medical evidence of DAA, the ALJ went through two processes. First, the ALJ determined whether, including the DAA, McGhee was disabled; and then, the ALJ had to decide whether the DAA was a contributing factor material to the determination of disability.

With regard to the first process, the ALJ determined that "including the claimant's substance use, the severity of the claimant's impairments met the criteria of section 12.04 of 20 C.F.R Part 404, Subpart P, Appendix 1." Filing No. 10-2 at 22. In addition, "if the

claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would have a severe impairment or combination of impairments." *Id.* at 25.

With regard to the second process, the ALJ found "if the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1." Filing No. 10-2 at 25. The ALJ made this finding after considering listing 1.15 (degenerative disc disease), 1.16 (degenerative disc disease), 1.18 (degenerative joint disease and right ankle injury), 12.04 (claimant's mental impairments if the substance use was stopped), and 12.06 (claimant's mental impairments if the substance use was stopped). *Id.*

The ALJ next found,

> [If] the claimant stopped the substance use, the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a) except she is able to: stoop, kneel, crouch, and crawl frequently; perform work that does not require sustained exposure to concentrated vibration or exposure to hazards such as climbing ladders or work at unprotected heights; perform work that does not require the operation of foot controls; perform simple tasks; exercise proper judgment in performing those tasks; respond appropriately to routine changes in the workplace; and interact with coworkers, supervisors, and the public occasionally.

Filing No. 10-2 at 27. With that RFC, the ALJ found "the claimant is unable to perform past relevant work." *Id.* at 31. But "if the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there have been jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* The ALJ determined McGhee could perform other unskilled sedentary work as a polisher, eyeglass frames; weight tester; and document preparer. *Id.* Finally,

the ALJ found "the substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use." *Id*. at 32. Consequently, the ALJ found McGhee was not disabled. *Id*.

The ALJ acknowledged McGhee's other impairments may be mentioned in the record from time to time, but they do not cause significant limitations in functioning or did not last for a continuous period of 12 months (20 C.F.R. § 404.1522 and § 416.922). Filing No. 10-2 at 22. The ALJ relied heavily on the medical evidence of record, SSR 85-28, and SSR 96-8p. *Id*. Regarding hypertension, the ALJ found "the record does not establish the presence of more than minimal limitation in McGhee's ability to perform work-related activity." *Id*. For the abnormal uterine bleeding, uterine fibroids, and iron deficiency anemia, the ALJ found "the record does not establish the presence of more than minimal work-related limitations that lasted at least twelve consecutive months." *Id*. For the chronic migraines, irritable bowel syndrome, and gastroesophageal reflux disease, the ALJ found the record "does not establish that the symptoms of these impairments occur with a frequency, duration, or severity that would impact McGhee's ability to perform regular work activity." *Id*.

The ALJ also acknowledged that including the substance use, McGhee has severe impairments that meet the listings. Filing No. 10-2 at 22–23. The ALJ states he relied on the medical evidence of record, the opinions of treating sources, and SSR 16-3p. *Id*. at 23. The ALJ considered the opinions of treating sources Dr. Jin, Darby, and Ramsey. *Id*. at 24. For Dr. Jin, the ALJ considered a completed form that generally indicated McGhee would meet listing 12.04, was completed at a time when McGhee was using alcohol and marijuana, and noted McGhee's impairments would continue in the absence of alcohol.

16

*Id.*; *see also* Filing No. 12-2 at 68–70.  The ALJ stated Jin's "finding of DAA materiality in the form is not supported by any explanation or discussion.  It is noted that Dr. Jin largely treats the claimant for physical conditions and the question on the form does not specify whether it refers to a mental or physical disability or both.  Thus, while the finding that the claimant meets 12.04 is persuasive, the finding regarding DAA materiality is neither supported nor consistent with other evidence and is not persuasive."  *Id*.

For Darby's assessment, the ALJ considered a completed form indicating McGhee would meet listing 12.04, was completed at a time when McGhee was using alcohol and marijuana, and indicated this is not material.  Filing No. 10-2 at 24; Filing No. 12-2 at 195–99.  The ALJ stated "he does not provide an explanation as to why the claimant's substance use is not material on the form, nor do his treatment notes support such a finding.  Thus, this portion of his opinion is only persuasive as to the finding that the claimant would meet the listing, but not as to the finding regarding materiality."  *Id*.  For Ramsey's assessment, the ALJ considered a completed form outlining her mental impairments, which did not find McGhee meets a listing, but did find extensive mental limitations; Ramsey indicated McGhee's substance use is not material to her limitations.  *Id.*; *see also* Filing No. 12-2 at 200–04.  The ALJ stated "he does not provide any support for this finding, nor is this finding consistent with the medical records or the record overall.  Accordingly, it is not persuasive."  Filing No. 10-2 at 24 (discussing Filing No. 12-2 at 200–04).  The ALJ concluded that the objective findings show McGhee's "statements concerning the intensity, persistence, and limiting effects of these symptoms are generally consistent with the evidence when the substance use is included."  *Id*.

The ALJ found if McGhee stopped the substance use, she would not meet the listings. Filing No. 10-2 at 25. The ALJ gave no consideration to the forms completed by treating sources Dr. Jin, Darby, and Ramsey. *Id.*; *see* Filing No. 12-2 at 68–70, 195–99, and 200–04. The ALJ states he relied on the medical evidence of record; McGhee's overall pattern of treatment; the efficacy of said treatment; McGhee's activities of daily life; McGhee's testimony; and the opinions of the state agency psychological consultant and Ramsey. *Id.* at 27–31. The ALJ found the evidence supports McGhee's ability to perform sedentary work, defined in 20 C.F.R. § 404.1567(a) and § 416.967(a). *Id.* at 27.

The ALJ considered McGhee's age, education, work experience, and RFC in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App'x 2, in determining whether McGhee could make a successful adjustment to other work. Filing No. 10-2 at 31. The ALJ noted that if McGhee stopped substance use, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.25. *Id.* Because McGhee's abilities were impeded by the additional limitations imposed, she relied on the VE's testimony in finding there were jobs in the national economy, such as a photocopy machine operator, that McGhee could perform. *Id.*

## STANDARD OF REVIEW

When reviewing a Social Security disability benefits decision, the district court does not act as a factfinder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Lowe v. Apfel*, 226 F.3d

969, 971 (8th Cir. 2000). Substantial evidence "is 'more than a mere scintilla.'" *Biestek v. Berryhill*, 587 U.S. 97 (2019) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "It means—and means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. of New York*, 305 U.S. at 229).

However, this "review is more than a search of the record for evidence supporting the [ALJ or Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). In determining whether there is substantial evidence to support the Commissioner's decision, this court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

## II.    LAW

### A. Sequential Analysis

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's RFC and his or her age, education and work experience. *Id.* At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Id.*

At step three, if the claimant shows that his or her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits. *Id.* If not, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4). At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*; *see Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

**B. Residual Functional Capacity ("RFC")**

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545. The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015). An ALJ's RFC determination (1) must give appropriate consideration to all of a claimant's impairments; and (2) must be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

In order to be supported by substantial evidence, an ALJ's RFC finding must be supported by a treating or examining source opinion. *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *see also Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007). A

claimant's RFC is a medical question and "an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008). "The ALJ 'may not simply draw his own inferences about plaintiff's functional ability from medical reports.'" *Id.* (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)).

### C. Treating Physicians and Other Medical Sources

With respect to claims filed after March 27, 2017, the Social Security Administration has adopted new regulations about the weight afforded to treating physicians' opinions. 20 C.F.R. § 404.1520c; *see Pemberton v. Saul*, 953 F.3d 514, 517 (8th Cir. 2020). Under the new regulatory scheme, the Commissioner "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. § 404.1520c(a). Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. *Id.* ALJs are required to "explain" their decisions as to the two most important factors—supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. § 404.1520c(c)(1)-(2). The ALJ is required to view a treating physician's opinion in the context of a claimant's entire medical record. *Despain v. Berryhill*, 926 F.3d 1024, 1028 (8th Cir. 2019). An ALJ must give "good reasons" for the weight given to a treating

physician opinion, irrespective of how much weight is given. *See Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008); *see also Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005).

### D. Subjective Complaints

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process: (1) first, the ALJ considers whether there are underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work. Social Security Ruling 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 FR 14166-01 (Mar. 16, 2016) (Policy Interpretation Titles II & XVI: Evaluation of Symptoms in Disability Claims).

In the second step of the analysis, in recognition of the fact that "some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence[,]" an ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Social Security Ruling 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 FR 14166-01, 81 Fed. Reg. at *14168. To determine the intensity, persistence, and limiting effects of an individual's

symptoms, the ALJ evaluates objective medical evidence, but will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. *Id.* However, the ALJ must not "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." *Id.* at *14169.

If an ALJ cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then he must carefully consider other evidence in the record—including statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in the Social Security regulations—in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. *Id.* Those factors include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id.* at *14169–70.

Social Security Ruling 16-3p also provides:

We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult or the ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim. Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

*Id.* at *14170. "[The Eighth Circuit Court of Appeals] has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000)). Allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications. *Id.* Similarly, a failure to follow a recommended course of treatment also weighs against a claimant's credibility. *Id.*

### E. Review of Record

This court "review[s] the record to ensure that an ALJ does not disregard evidence or ignore potential limitations but [does] not require an ALJ to mechanically list and reject every possible limitation." *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). An ALJ is not required to discuss all the evidence in the record to show that it was properly considered. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). "Simply because a matter is not referenced in the opinion does not mean the ALJ failed to rely on the evidence in

making his determination.   However, this does not give an ALJ the opportunity to pick and choose only evidence in the record buttressing his conclusion." *Taylor ex rel. McKinnies v. Barnhart*, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004).  An ALJ "must minimally articulate his reasons for crediting or rejecting evidence of disability." *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)).

## III.    DISCUSSION

### A. Iron Deficiency Anemia

At step two, the claimant bears the burden of proof and must show they have a severe medically determinable impairment.   20 C.F.R. §§ 404.1520(c) and 416.920(c).  A severe impairment is "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities" and must have "lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. §§ 404.1520(a)(4ii) and 404.1509.

The ALJ found McGhee's iron deficiency anemia is not a severe impairment.  Filing No. 10-2 at 22.  The ALJ acknowledged the record showed treatment for abnormal uterine bleeding, uterine fibroids, and iron deficiency anemia.  *Id*.  However, while McGhee was hospitalized overnight and received a blood transfusion for this, the record, according to the ALJ, does not establish the presence of more than minimal work-related limitations that lasted for a continuous period of at least 12 months.  *Id*.

McGhee claims her iron deficiency anemia is a severe impairment because the medical record establishes this impairment has caused her to experience fatigue, dizziness, shortness of breath, and chest pain that impair her ability to perform basic work activities and it has lasted for a continuous period of over 12 months.  Filing No. 15-1 at

11.  McGhee claims she has been treated for heavy bleeding since at least 2019; the frequent and heavy bleeding has resulted in low iron saturation and low levels of hemoglobin; that in addition to the hospitalization and blood transfusion, she experiences fatigue, shortness of breath, dizziness, feeling faint, chills, and chest pain due to her anemia; these symptoms have been present since at least April 19, 2019, and this condition has been treated and evaluated continuously since then. Filing No. 15-1 at 11.

After a full review of the record, the Court finds that she did have iron deficiency anemia for a continuous period of at least 12 months. She consulted with multiple doctors regarding birth control, IUD treatment and other forms of therapy. In December 2021, McGhee went to the Emergency Department for heavy menstrual bleeding and was hospitalized overnight, and she received blood transfusions. McGhee had the Mirena IUD placed the following week for treatment; from then on, she reported that her heavy menstrual bleeding is much improved after IUD placement. However, prior to that time, she did in fact have more than a 12-month period of iron deficiency and related symptoms. The ALJ clearly erred in this regard.

### B. Chronic Migraines

The ALJ also found McGhee's chronic migraines are not a severe impairment. Filing No. 10-2 at 22. The ALJ acknowledged the record showed some treatment for chronic migraines but does not establish that the symptoms of this impairment occur with a frequency, duration, or severity that would impact McGhee's ability to perform regular work activity. *Id*.

McGhee claims her chronic migraines are a severe impairment because she has a well-established history of chronic migraines, demonstrated by medical records dating

back to 2016.  Filing No. 15-1 at 12.  McGhee claims her treatment for migraines and corresponding symptoms of migraines are noted frequently throughout the medical record from 2019 through February 2022.  Id.

The Court finds, after a full review of the record, that McGhee's symptoms of chronic migraines occurred with a frequency, duration, and severity that would impact her ability to perform regular work activity.  At times the medicine helped improve the migraines.  However, she still suffered, as shown in the above recitation of the evidence, that the migraines persisted and caused her a number of emergency room and doctor visits over the course of several years.  Such evidence does not support the ALJ's finding that McGhee's chronic migraines are non-severe impairments.

### C. Vocational Expert's Testimony

In the fourth step of the sequential analysis, the ALJ considers whether a claimant's impairments keep her from doing past relevant work.  20 C.F.R. § 404.1520(e).  A claimant's RFC is the most that one can do despite his/her limitations.  20 C.F.R. § 404.1545.  The claimant is not disabled if the claimant retains the RFC to perform: "1) the actual functional demands and job duties of a particular past relevant job; or 2) the functional demands and job duties of the occupation as generally required by employers throughout the national economy."  Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996).  During this step, an ALJ may consider the vocational expert's testimony when determining the claimant's RFC.  Wagner, 499 F.3d at 853–54.  The ALJ often asks the vocational expert a hypothetical question to help determine whether a sufficient number of jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant.  Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005).

A hypothetical question posed to a vocational expert as part of the RFC determination must be properly phrased to include all relevant impairments that are substantially supported by the record as a whole. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). If the hypothetical question does not include all relevant impartments the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's determination. *Id.*

At the ALJ Hearing, the VE was first asked to classify McGhee's past work. Filing No. 10-2 at 47–48. The VE stated McGhee's previous job as a home health aide is Dictionary of Occupational Titles ("DOT") code 355.674-014 and is semiskilled at an SVP of 4 in the medium exertional category. *Id.* at 48. The VE stated McGhee's previous job as a hair stylist is DOT code 332.271-018 and is skilled at an SVP of 6 in the light exertional category. *Id.* at 50. Everyone agrees that McGhee was unable to perform her past relevant work.

Next, the VE answered hypothetical questions from the ALJ and non-attorney representative. Filing No. 10-2 at 71. The primary issue involved is the SVP and Reasoning Levels for sedentary work. The ALJ first asked the VE the following hypothetical question:

> Just for these purposes, I want you to assume an individual who has past work in the two occupations that you identified before. I want you to assume for starters, this person is able to perform light work as that term is defined in the DOT, and in the regulations. This person is able to stoop, kneel, crouch, and crawl frequently; is able to perform work so long as it does not require sustained exposure to concentrated vibration or exposure to hazards such as climbing ladders or work at unprotected heights. This person is able to perform work that does not require the operation of foot controls; is able to perform simple tasks; is able to exercise proper judgment in performing those tasks; is able to respond appropriately to routine changes in the workplace; and is able to interact with coworkers, supervisors, and the public occasionally. It looks like that person would not

be able to perform either of those past two occupations if only because of the limit to simple tasks. Would there be an occupational base otherwise that a person could perform if they could do all those things I just listed?

Filing No. 10-2 at 71–72. The VE testified there would be work available at the light exertional category and unskilled as an SVP of 2, including occupations such as a merchandise marker, mail sorter, and photocopy-machine operator. Id. at 72. The ALJ then asked the VE if there would be an occupational base at the sedentary exertional level, and to assume a hypothetical worker with all the above limitations, and the additional limitation to perform sedentary work instead of light work. Id. The VE responded "yes," and testified there would be work available at the sedentary level and unskilled as an SVP of 2, including occupations such as a polisher, eyeglass frames; weight tester; and document preparer. Id. at 72–73.

The non-attorney representative then asked the VE for the reasoning level on each job in hypothetical one and two. Filing No. 10-2 at 73. The VE testified in hypothetical one all three jobs are a Reasoning Level 2, and in hypothetical two a polisher, eyeglass frames is a Reasoning Level 2, and the weight tester and document preparer are a Reasoning Level 3. Id. McGhee claims the ALJ relied on an incomplete RFC because there was a conflict between the VE and the DOT[1].

The Court first finds that the ALJ failed to include all of the limitations that the claimant had in this case. The VE testified if those issues, which included a requirement for a sit/stand option, a limitation for hand manipulations and overhead reaching, and a limitation including that at least one day per month the claimant would "interrupt

---

[1] The Court agrees that the DOT and the VE may have created a conflict in the appropriate level of the jobs between Level 2 and 3 in this case. However, because the Court finds in favor of the claimant and orders benefits, this conflict is not particularly relevant and need not be decided at this point.

production or work and have to be sent home", that those requirements would prevent McGhee from performing any work in the sedentary category. Filing No. 10-2 at 76–77. Even this hypothetical does not include all of claimant's acknowledged mental health issues. The ALJ erred in this regard. As discussed herein, substantial evidence in this case supports these requirements. This is not substantial evidence that would support a finding that McGhee can do sedentary work.

### D. Drug Addiction and Alcoholism

A claimant is not disabled if DAA is a contributing factor material to the Commissioner's determination of disability. 42 U.S.C. § 423(d)(2)(c). If a claimant is found to have DAA, the ALJ "must project the severity of the claimant's other impairment(s) in the absence of DAA. We make this finding based on the evidence in the claimant's case record." 20 C.F.R. § 404.1535 and § 416.935; SSR 13–02p, 2013 WL 621536 (Feb. 20, 2013). DAA is material if the claimant's other impairment(s) would improve to the point that the claimant would not be disabled in the absence of DAA. On these findings, the ALJ would deny the claim. To support a finding that DAA is material, the ALJ must have evidence in the case record demonstrating that any remaining limitations were not disabling during the period of abstinence. Id.

The ALJ found that if McGhee stopped the substance use, she would not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments in the listings based on her alleged six-week period of abstinence. Filing No. 10-2 at 25. The ALJ also found if McGhee stopped the substance use, she had the RFC to perform sedentary work with additional postural, hazard, and mental limitations based on her alleged six-week period of abstinence. Id. at 27.

McGhee argues there is no conclusive evidence in the medical record of a relevant period of abstinence from alcohol use since she began treatment for her mental health conditions.  Filing No. 15-1 at 18.  McGhee claims the ALJ seems to rely on a period of abstinence from early November 2020 through December 2020, which correlated with a period of improved functioning; however, she claims evidence from the medical record narrows the scope of this period of sobriety to less than a month.  Id.  She claims this brief window of time should not constitute a sufficient period of abstinence.  Id. at 19.

The Court agrees with McGhee.  The record is fully developed and there is insufficient evidence to show McGhee's impairments would improve to the point of non-disability in the absence of alcohol use.  Under the circumstances, the Court finds substantial evidence in the record inconsistent with the ALJ's DAA finding, and the decision should be reversed.  Because there was not a relevant period of abstinence, and there is no substantial evidence to show McGhee would not be disabled if she stopped drinking for 30 days.  The Court finds that the ALJ's decision is without substantial evidence.

IV.     CONCLUSION

The Court finds that when reviewing the total evidence of claimant's disabilities, the ALJ's findings and conclusions are not supported by substantial evidence. Accordingly, the Court finds her disabled.  The Court finds that the ALJ failed to address evidence in the medical record when reviewing claimant's severe impairments at Step 2 of the 5-step sequential analysis wherein the ALJ determined that claimant's mental health impairments would no longer be disabling in the absence of the alcohol use. Based on this record, a period of abstinence for maybe one month, does not show a

period of abstinence.    The Administration has ruled that they "do not know of any research data that we can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol." (SSR 13-2p(7)(a)).    The evidence is overwhelming in this regard.  McGhee has been diagnosed with PTSD, anxiety, and bipolar disorder. At step two, the ALJ determined that the claimant's severe limitations included degenerative disc disease of the cervical and lumbar spines; degenerative joint disease of the bilateral knees, right ankle injury, major depressive disorder, generalized anxiety disorder and alcoholism.  She has not made a meal in 10 years.  She only has a 6th grade education.  McGhee suffered from anemia and chronic migraines.  She had numerous doctors.  She has gone to the hospital on a number of occasions.

When the VE was questioned by the representative and these limitations, a requirement for a sit/stand option, a limitation for hand manipulations and overhead reaching, and a limitation including that at least one day per month the claimant would "interrupt production or work and have to be sent home," the VE testified that there would be no work for the claimant.  The ALJ found that these limitations, both physical and mental, "would not have an impairment that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1."  The ALJ further found that the claimant was capable of doing sedentary work.  There simply was no substantial evidence for these finding, particularly here, where the medical issues are so well-documented.    Claimant's chronic migraines date back in the medical records to February 2016.  She was still being treated through February 2022.  Her iron deficiencies and bleeding issues have clearly lasted more than 12 months.  The ALJ agrees that she

has multiple mental health issues. The evidence overwhelmingly supports these diagnoses and the relevant and related symptoms of this impairment. Further, while these individual impairments alone might not appear to be debilitating, when taken in conjunction and in combination with each other, they clearly require a finding that the claimant is disabled.

With regard to the alcohol use, the ALJ determined, without substantiating evidence, that absent the alcohol use, claimant's marked limitation in concentrating, persisting, or maintaining pace and in adapting or managing oneself, would, in the absence of DAA, improve to the point of only moderate limitations in both these areas of functioning. The ALJ ultimately determined that "if the claimant stopped the substance use, the claimant would not have an impairment… that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1", Filing No. 10-2 at 27. There is no evidence to support this determination. For all these reasons, the Court finds McGhee is disabled. The Court also finds that McGhee is entitled to file a motion attorney fees in this case if plaintiff wishes to file for the same.

"Where further hearings would merely delay a receipt of benefits, an order granting benefits is appropriate." Hutsell v. Massanari, 259 F.3d 707, 714 (8th Cir. 2001) (quoting Parsons v. Heckler, 739 F.2d 1334, 1341 (8th Cir. 1984). The weight of the evidence discussed above points to a conclusion that Claimant was disabled during the relevant time period. There is not substantial evidence to support the findings of the ALJ, and there is overwhelming evidence that Claimant cannot perform any of the jobs listed by the VE. Accordingly, the Court will grant Claimant's motion to reverse the decision of the Commissioner.

**THEREFORE, IT IS ORDERED THAT** Plaintiff's motion to reverse, Filing No. 15, is granted, and Defendant's motion to affirm, Filing No. 18, is denied.  A judgment will be entered in accordance with this Memorandum and Order.

**IT IS FURTHER ORDERED THAT** Plaintiff has 21 days from the date of this Memorandum and Order to file a motion for attorney fees if she wishes to do so.  Upon receipt of said motion and brief, the Commissioner shall have 14 days thereafter to file a response.

Dated this 18th day of September, 2024.

BY THE COURT:

s/ Joseph F. Bataillon_____
Senior United States District Judge